CALEB W. LORING, APPELLANT, vs. DUNNING & PALMER, ET ALS., APPELLEES.

1. It is not a good answer to a creditor's bill that the liability of one of the defendants as a special partner was limited by the articles of co-partnership. Such plea should be made, if at all, when the original suit was brought. The judgment fixed the liability.

2. Mere inadequacy of price in the sale of the property of one in embarassed circumstances is not evidence of fraud as against creditors, but a sale of property of the value of fifteen to twenty thousand dollars for an indefinite sum, (no price being agreed on,) paid or to be paid, not exceeding $5,000, under circumstances showing that the purchase was made at the solicitation of the seller and because of her pecuniary embarassments, and the intention of the purchaser to give the grantor and her family the benefit of the proceeds of the property over and above the purchase money, will warrant a decree that the conveyance was fraudulent on the part of the grantor, and that as to the grantee it be held to be a security for the amount advanced by him to or for the benefit of the grantor.

Appeal from the Circuit Court for Putnam county.

The complainants, Dunning & Palmer and F. S. Selover & Co., filed, August 15, 1874, a bill in chancery against Sophia R. Carr, John T. Carr and James W. Allen, then lately partners doing business in St. Johns county, under the firm name of B. E. Carr & Co., and James Burt, trustee, George Burt and Caleb W. Loring in behalf of themselves and other creditors of B. E. Carr & Co.

The bill alleges that Dunning & Palmer on June 6th, A. D., 1873, recovered a judgment against the defendants, B. E. Carr & Co., in the Circuit Court of Duval County, for the sum of $1295 and 30-100; that on the 6th day of June, A. D. 1873, T. S. Selover & Co. recovered judgment against said B. E. Carr & Co., in the same court, for the sum of $498 and 68-100; that both of said judgments were duly docketed in the county of Putnam; that afterwards executions were duly issued upon both said judg-

ments and delivered to the sheriff of said county of Putnam and they have been duly returned to the clerk's office of said county unsatisfied, with the return of said sheriff thereon that no property can be found belonging to said defendants, B. E. Carr & Co., or to any one of said defendants, subject to be levied upon and sold under said execution; that neither of the defendants are seized or possessed of any property in their own name liable to legal sale under said executions; that prior to the recovery of said judgments, the said defendants, under the firm name aforesaid, carried on the business of merchants and traders in St. Augustine, in the county of St. Johns aforesaid, and that said judgments were recovered for goods, wares and merchandize sold and delivered to them; that ·by the terms of the articles of copartnership under which said defendants carried on the said business, the defendant, Sophia R. Carr, had the control and direction of the business of said firm, and that in the purchase of goods and management of the business of said firm she had, under said articles, a controlling interest and voice; that the complainants sold and delivered the goods, wares and merchandize to the defendants upon the credit and financial responsibility of the defendant, Sophia R. Carr, and at the request of the said Sophia R. Carr as one of said firm; that complainants had been informed and believed prior to the sale of said goods by the defendants and by the said Sophia R. Carr, that the said Sophia R. Carr had a large income from property held in trust for her general use and benefit, both in the State of Florida and in the State of Massachusetts, and that such property so held in trust, or the income thereof, or both, would be ample security for, and liable and subject to the payment of any obligations or judgments against said defendant, Sophia R. Carr, and reposing confidence in the credit of said Sophia R. Carr, arising from said trust estate, they sold and delivered said goods, wares and merchandize

to defendants; that Sophia is the widow of Burrough E. Carr; that said Burrough E. Carr died intestate some time prior to the formation of said firm of B. E. Carr & Co., and prior to the sale and delivery to defendants of said goods, wares and merchandize; and that for several years subsequent to the death of said Burrough E. Carr, the said Sophia received her support and maintenance chiefly from the business and goods and merchandize of said firm of B. E. Carr & Co., and not out of the trust estate hereafter set forth; that the defendant, Caleb W. Loring, is a brother of the said Sophia R. Carr, and holds in trust in the State of Massachusetts for the said Sophia a large amount of valuable real and personal property, and that the income thereof by way of rents and interest, or otherwise, is largely in excess of the necessary and proper expenditures for the support and maintenance of the said Sophia; that the defendant, James Burt, is a trustee, as hereinafter stated, for the said Sophia, and as such trustee is seized in fee and has the possession of a large quantity of valuable real estate in the town of Palatka, Florida; that on or about the 13th day of March, A. D. 1852, one Robert R. Reid and Mary, his wife, of Palatka, and Burrough E. Carr and Sophia, his wife, and and George Burt, and Lucy, his wife, of St. Augustine, sold and conveyed by deed in fee unto one Isaac H. Bronson, as the party of the second part, about twelve hundred acres of land situate in and about what is now the town of Palatka.

That on the 22d day of March, A. D. 1852, as complainants are informed and believe, the said Isaac H. Bronson duly made a declaration of trust under the deed aforesaid in favor of the said Sophia R. Carr and Lucy Burt, whereby the said Sophia and Lucy were declared the *cestuis que trust* of said property conveyed to the said Isaac H. Bronson; and the said Bronson promised and bound himself to manage and control said tract of land under certain restric-

tions, and to pay over to each of the said *cestuis que trust* or beneficiaries, or to their heirs and assigns, one-third of the net proceeds arising from said lands, either by sale or otherwise; that said declaration of trust has never been recorded in said Putnam county, nor elsewhere, to the knowledge of complainants, who have no knowledge of and have no means of ascertaining the exact terms and provisions of said declaration of trust, except by discovery from the defendant; that on or about the 26th day of May, A. D. 1855, the said Burrough E. Carr, Sophia Carr, George Burt and Lucy Burt executed an instrument in writing, in the presence of witnesses, wherein it is recited that a declaration of trust was declared by the said Bronson on the 22d day of March, A. D. 1852, of the character before stated. And it is also recited in said instrument that on the 15th of May, 1855, the said Burrough E. Carr and George Burt, and the said Isaac H. Bronson, made and executed an agreement whereby it was agreed and provided that said Bronson should and was, from and after the date thereof, released and discharged from the further execution of said trust, and from all liability on account thereof to said *cestuis que trust.* And the bill further states that by the terms and effect of the aforesaid instrument of May 26th, 1855, the said Burrough E. Carr and Sophia, his wife, George Burt and Lucy, his wife, appointed the defendant, James Burt, as the person to take the legal title to said real estate, and thereby directed and authorized and required said Bronson to convey all of said real estate then undisposed of in fee to the said James Burt, who is to hold the said property in trust, and to execute to the said parties to said instrument such declaration of trust as might hereafter be agreed upon; that soon after the aforesaid instrument was executed, the said Bronson did execute and deliver a deed of conveyance of said real estate to the defendant, James Burt, whereby the legal tite passed and vested absolutely in the said James

Burt; that while it is notorious and generally known in said county of Putnam, that the deed last aforesaid was executed and delivered, said deed has never been recorded in said county; that on the 3d day of August, A. D. 1858, Burt did execute and deliver a declaration of trust in favor of said defendant, Sophia R. Carr, whereby he agreed and bound himself to hold a certain portion of said real estate, hereinafter specified, in trust for the said Sophia R. Carr, her heirs and assigns; that in the said declaration of trust last mentioned, it is duly recited that James Burt aforesaid, at the instance and request of the said Burrough E. Carr and Sophia, his wife, and George Burt, had conveyed absolutely in fee simple, by deed bearing date the 3d day of August aforesaid, one-half of the unsold part of said Palatka tract property then remaining in his hands to George Burt; that said lands held in trust by the said James Burt for the said Sophia, her heirs and assigns, have been divided into town lots of the town of Palatka; that before the declaration of trust last aforesaid was made, the part of said trust property or real estate originally conveyed to said Bronson as aforesaid, which belonged to and was intended for the said Lucy Burt, had been duly set apart to her, and that the said Lucy Burt departed this life several years ago, and that her heirs have no interest whatever in the aforesaid lots claimed as the portion of defendant, Sophia R. Carr; that on or about the 10th day of November, A. D. 1870, the said Sophia R. Carr, Maria J. Carr, Annie C. Gilbert and John T. Carr, the widow and heirs of said Burrough E. Carr, made and executed a certain writing, under seal, to Wilkinson Call, Esq., wherein it is recited that certain real estate in the town of Palatka aforesaid, meaning the real estate hereinbefore mentioned, was conveyed to James Burt by said Burrough E. Carr, in his life-time, and that said James Burt had made a declaration of trust of said property for the use and benefit of said Sophia R. Carr, and that said

declaration had not been recorded, and that said Sophia R. Carr desired said trust to be made of record and placed beyond a doubt, and to make said Wilkinson Call trustee, and to make the trust to him irrevocable; that after such recital the said writing purports to be a power of attorney to the said Call to sell said real estate, provided it can be sold for $24,000, and invest the proceeds in bonds of the United States, the bonds to be held by Call, under his sole control and direction, in trust for said Sophia; that after the execution of said writing to Call, the defendant, Sophia R. Carr, lost her confidence in Call, and pretending to be alarmed for the safety of her property. Afterwards, to-wit, on or about the 29th of December, A. D. 1871, she, the said Sophia R. Carr, and the said Wilkinson Call made and executed a certain deed or instrument, under seal, to the defendant, Caleb W. Loring, whereby the said Sophia and the said Caleb W. Loring pretend that all the interest of the said Sophia R. Carr in, to, and of the said real estate was conveyed to the said Loring; that the consideration expressed in the deed last aforesaid is one thousand seven hundred and sixty-seven and 7-100 dollars, and other good and valuable consideration; but the complainants aver that the defendant, Loring, did not purchase said real estate in good faith for good and valuable and adequate consideration, and did not pay anything of value for said deed to him. Loring is a brother of the said Sophia; that said deed is a mere pretence and device entered into between said Sophia and Loring for the double purpose of wresting from the said Call any authority and control which he then was supposed to have over said property, and to protect the interest of the said Sophia in said land and lots aforesaid, and to place said property beyond complainants' reach; that said Loring was, before said pretended deed was made, a trustee for dsai Sophia, and as such trustee, from time to time, paid over money arising from said trust estate held by him to

the said Sophia, and that if any money was delivered to said Sophia by the said Loring at the time said deed was made, it was the money of the said Sophia, or money of the said Loring advanced to the said Sophia as a mere color and pretence, to be re-imbursed out of said trust estate held by said Loring; that the goods, wares, and merchandise were sold and delivered before the last aforesaid deed was given, and said B. E. Carr & Co. were then indebted for the same, and by such deed said Sophia R. Carr and said Loring hoped and intended to defraud your complainants out of their demands; that said deed last mentioned is a mere colorable deed, and not real and *bona fide*, and that if it were otherwise the said Loring, if he acquired any interest in said real estate, he acquired the same with notice that James Burt aforesaid held the legal title thereto and property aforesaid in trust as aforesaid, and the complainants aver that the said Loring and the said Sophia R. Carr are now and have been for sometime endeaving to persuade the said James Burt to convey by deed in fee the said land and town lots to the said Loring for the purpose of obstructing the complainants and other creditors in the recovery of their demands; that said Loring in his answer, filed March 19, 1872, to a suit brought in said Circuit Court of Putnam county, by James R. Van Brunt and Henry L. Slaight against said Sophia R. Carr, James Burt, and Caleb W. Loring, admitted that the legal title to said land and lots was vested in the said James Burt; that the said real estate in Palatka aforesaid is estimated to be of the value of above twenty thousand dollars, and that said Sophia R. Carr has and receives, and is entitled to receive, from the property held in trust in the State of Massachusetts by the said Loring an annual income of several thousand dollars, which is largely in excess of the amount necessary for her support and maintenance, and the complainants aver that they have been informed, not only by the aforesaid deeds and

declaration of trust, but otherwise, and believe and allege that neither the said James Burt nor the said Loring hold any of the trust property aforesaid upon the specific trust to apply the income for the support of the said Sophia; that said Sophia R. Carr promised to pay some of the creditors of the said firm of B. E. Carr & Co. out of the money arising from said trust estate in the State of Massachusetts, but now refuses to do so, and pretends and alleges that said trust estate is not subject to the payment of said creditors.

There was a decree *pro confesso* as to the defendants, except Loring, who answered.

The answer of Loring admits that judgments were obtained and executions thereon issued and the same returned as charged, and says he has no information enabling him to say whether the firm of B. E. Carr & Co. have any property subject to execution, and admits that said judgments were obtained for goods, &c., sold to B. E. Carr & Co.; and says that it is wholly immaterial and irrelevant as to whether or not the said Sophia R. Carr had the chief control of the affairs of the said firm of B. E. Carr & Co., yet that he is informed and believes that by the articles of copartnership between the members of the said firm the said Sophia did have a voice in certain particulars in the affairs of the firm; but this information has been received by him since this suit was begun, and he had no knowledge of the terms of said partnership at the time he acquired title to said lands as set forth in the answer. The answer states that the articles of copartnership between the members of the said firm of B. E. Carr & Co. were published as required by the laws of the said State of Florida authorizing limited copartnerships, and that said articles as published contained the following clause, viz: "Sophia R. Carr shall be a special partner in said firm, with a liability limited to the amount invested by the said Sophia R. Carr, viz: the sum of three thousand dollars, or about that sum, and the

said Sophia R. Carr shall not in any event be liable for the debts of said firm in any other respect or extent, except that the interest of the said Sophia in the said firm and its assets shall be liable for the debts of the same;" and claims that the publication of said articles containing the above quoted provision was, in matter of fact, full, complete, and lawful notice to complainants of the extent of credit that could be given said firm because of the connection of the said Sophia therewith, and also of the extent of her responsibility for debts contracted by said firm; that the goods were sold complainants on the faith and belief that the said firm of B. E. Carr & Co. would pay its own liabilities, and that the liability of the said Sophia R. Carr would be limited in accordance with and under the said articles of copartnership; that the said Sophia did not, after her husband's death, for several years receive her support chiefly from goods, &c., of said firm of B. E. Carr & Co., but received her support chiefly from funds forwarded to her by himself; that the defendant is in no manner by blood or marriage, near or remotely, related to the said Sophia R. Carr; that he does hold certain property in Massachusetts under a trust of the strictest nature, the income of which, in his discretion, he is empowered to pay to said Sophia, as will be fully and conclusively seen by and from the will of Sally Blake, mother of the said Sophia; that he is the sole and surviving trustee named in said will; that James Burt was at one time trustee for Mrs. Sophia R. Carr of property in Palatka, Putnam county, Florida, but is not now, nor has he been trustee for her since the recovery of the judgments set forth in the complainants' bill, nor since the commencement of proceedings in the actions in which said judgments were obtained. The answer admits the execution and delivery of each and every deed, declaration and instrument referred to, but insists, however, that the same are not complete, inasmuch as

they do not contain a copy of a deed executed and delivered March 29, 1871, by said Sophia R. Carr to Wilkinson Call of the said property in Palatka, Putnam county, Florida, the said deed being of record in Putnam county, and being a conveyance of the property in trust for the use and benefit of Sophia during her life, with limitations over, and giving power to Call to sell and convey real and personal property, receive income and payments, collect, compromise and settle claims, to make investments and to manage the mercantile interests of Sophia, and make certain purchases, and to mortgage her property to raise money for certain purposes, and large discretionary powers.

The answer also states that on December 27th, not on the 29th, A. D. 1871, the said Sophia R. Carr and Wilkinson Call executed this deed; that the consideration expressed in said deed is truly and correctly stated; that the true reasons and occasion and circumstances that led to the making of said deed and his purchase of the property described and conveyed, are these: Mrs. Sophia R. Carr, while in Massachusetts, in December, 1871, informed this defendant that she was embarassed, and in great trouble in relation to the settlement of her husband's estate; that it was necessary to raise money for the purpose of settlement, and he was requested by her and her friends to buy the house and store property in St. Augustine, Fla., belonging to that estate, and at what was represented to him as a very low price. He sent Samuel Snow, Esq., his attorney, to Florida, with funds of defendant's own, for the purpose of buying that property. Mr. Snow found the title not satisfactory and refused to buy. Mr. Snow was also employed by him for the benefit and in the interest of Mrs. Carr, to assist her in her trouble in the matter of the settlement of her husband's estate. He found Wilkinson Call with a conveyance, and in possession, with right of control of all her personal property, and the amount in St. Augustine, Florida,

amounted to many thousand dollars, as he is informed and believes over four thousand dollars, besides a large amount of debts due the firm; also of the Palatka property described under said deed to Call; that Call was threatening to sell the said property in Palatka to meet payments he had to make for Mrs. Carr in settlement of the estate named. He was drawer and endorser of a draft made at Jacksonville, Florida, May 25, 1871, and held there by the Freedman's Saving & Trust Company, on which he had signed as attorney for the estate of B. E. Carr, and for Mrs. Sophia R. Carr, payable in sixty days, for $1,640. The draft had been protested, principal, interest and protest amounted to $1,767.07. Mrs. Carr was anxious to get the property conveyed by her to him out of his hands and control, that she might be untrammelled by him in the disposition of the same, and the settlement of her husband's estate. She besought Mr. Snow to aid her. Various plans were proposed and set aside. Finally, as a last resort, Mr. Snow proposed to Mr. Call and to Mrs. Carr to buy for and in the name of this defendant the Palatka property, provided he could obtain the consent of of this defendant. The said consent was obtained by telegraph. He offered in payment of said property, and upon the understanding that Mr. Call would give Mrs. Carr possession and free control of her other and her personal property in St. Augustine, Florida, to take up and pay the draft above described, have this defendant assume and pay the expenses of his trip and his cash disbursements made in said trip for Mrs. Carr, and on the part and in the name of this defendant, assume an obligation entered into by said Call for Mrs. Carr, in favor of one Margaret Cook, guardian, of John R. Hanson for one thousand dollars, which was represented and claimed by said Call to be charged on the said Palatka property; also agreed to pay whatever sum might, in settlement between said Call and

said Sophia, be found due said Call, claimed by him to be about the sum of one thousand dollars; also to pay the charges of A. R. Meek, Esq., of Jacksonville, Florida, in obtaining and bringing about a settlement between them; also to pay A. D. Basnett, Esq., of Jacksonville, one hundred dollars for services for Mrs. Carr in the matter of the sale, or steps for the sale, of the house and store property before named in St. Augustine; also the taxes then due and unpaid upon the said Palatka property. Mrs. Carr, under the belief that the said property could be sold ultimately at a large price, for some time declined to yield her consent for the conveyance by Call, unless Mr. Snow would, in the name of this defendant, give her an obligation that this defendant would hold said property as security for his advances, payments and proposed obligations. This Mr. Snow positively refused to do, requiring that the purchase must be free from any trust in her favor. The proposition of Mr. Snow above set forth substantially was finally accepted and the conveyance was executed.

That at the time of the execution and delivery of the deed from Call and Sophia R. Carr to defendant, the sum of one thousand, seven hundred and sixty-seven dollars and seven cents ($1,767.07) was paid by said Snow for defendant to the Treasurer or President of the Freedman's Saving and Trust Company at Jacksonville, Florida, at the request of said Sophia R. and said Call, in payment of the draft. This sum and a small sum of money at that time advanced to, and paid out for Mrs. Carr, constitute the entire amount of money advanced to and for said Mrs. Carr *at the time stated* by Mr. Snow in behalf of this defendant. These were paid in Jacksonville, Florida. Mrs. Carr was there at the time; this defendant was in the city of Boston, Massachusetts. That "the good and valuable considerations" named in the deed of said Call and Mrs. Carr to him was as follows:

1. The services rendered Mrs. Carr by Mr. Snow in ob-

taining from said Call control for her of her personal and other property in St. Augustine, amounting to some thousands of dollars, including a stock of merchandise in St. Augustine, thus enabling her to carry on uninterruptedly, and free from control of said Call, or from any interference by him, and all possibility of any pretence by him of right to control or interfere, the mercantile business then being carried on in said city under the firm name of B. E. Carr & Co., successors. This business was her own, and was thereafter conducted by her for several years.

2. An agreement of this defendant, executed by said Snow as his attorney, wherein and whereby this defendant was obligated—1st, to pay said Wilkinson Call whatever sum should in settlement of all accounts between said Call and Mrs. Carr be found to be due said Call; the sum claimed by said Call to be due him was about one thousand dollars; 2d, to pay A. R. Meek, Esq., of Jacksonville, Fla., for all services he might render Mrs. Carr, for whom he was to act as attorney in making, bringing about or arriving at and consummating the settlement between said Call and Mrs. Carr; 3d, to pay A. D. Basnett, Esq., of Jacksonville, one hundred dollars for services rendered Mrs. Carr in the matter of the estate of her late husband; 4th, to assume an obligation to pay one thousand dollars, at eight per cent. per annum interest, which had been entered into by said Call in behalf of Mrs. Carr with one Margaret Cook, of St. Augustine, Florida, guardian of John B. Hanson, minor, and interest then due thereon.

3. An agreement of this defendant, made by said Snow as his attorney, that all expenses of the trip of said Snow to and from Florida, and his cash disbursements, should be paid by this defendant, the same amounting to $381.50; also to pay all back taxes upon the property conveyed.

That under the will of Sally Blake, deceased, the mother of Mrs. Carr, he holds property in trust of the strictest nature,

the income of which he is empowered to pay upon his own discretion to Mrs. Carr, or in support of Mrs. Carr and her family, or add to the principal for the benefit of the children of Mrs. Carr upon her death, all of which will clearly and fully appear by reference to provisions of said will before cited. And he further says that the income of said trust property is not large, and that Mrs. Carr has many children, and some grand-children, who are in need of and require assistance and support; and that the income of said trust is not more than sufficient for the support of Mrs. Carr, and those of her family with her and requiring assistance; that James Burt was not consulted relative to said sale of the Palatka property to this defendant, or the price to be paid therefor, but that in pursuance of an endeavor on his part to get all property of Mrs. Carr from the possession and control of said Call, said Snow advised with said James Burt as to whether, if said Call could be prevailed upon to convey or transfer the title to Mrs. Carr's property in his hands as trustee to this defendant, there was anything to prevent him, the said Burt, from conveying to this defendant the naked legal title supposed to be in him in relation to the said Palatka property. Call, however, declined under every arrangement to assign his trust to this defendant. Then it was that said Snow commenced to negotiate with Mrs. Carr and said Call for the absolute purchase, in the name of this defendant, of said Palatka property, finally closing the transaction as herein above stated; that in the matter of this purchase said Burt was not advised with, and could have known nothing until after it was closed; that with his own private and individual funds, and his own obligations, entered into on his behalf by said Samuel Snow as his attorney, he became and was the *bona fide* purchaser, in his own right, of said Palatka property, for good and valuable considerations, and did not take the conveyance thereof under any agreement whatever, written or oral, understood or im-

plied, to hold the said property for said Sophia R. Carr, or to sell the same and pay its purchase-money, or any part or portion of it to her; but that he does not intend personally to make any profit out of said transaction; that if said estate should sell for more than the cost and expenses, he intends to pay the same into the principal fund of the trust estate, which he holds in strict trust, as before set forth, for said Sophia R. Carr and her children. But he says he has never made any agreement or contract with said Sophia relating to said purchase of said Palatka property, or to his disposition or use thereof, or as to his doings therewith; that since the *bona fide* deed from said Call and Sophia R. Carr, he has not returned said Palatka property to the tax assessor of Putnam county, Florida, for assessment, inasmuch as it is usual, if not the universal rule, to assess property in the name of the party in whom the legal title is found or supposed to be; and it has been found under the index of the record of deeds for said county of Putnam; that the naked legal title said property was in James Burt; he believes the same is assessed to Burt, and defendant has contented himself in forwarding from year to year to said Burt funds with which to pay the taxes assessed upon said property, and said Burt has drawn upon him for that purpose; that defendant has no discretion under the trust held by him as aforesaid to use, and has not used said income for any purpose connected with or in matter of said Palatka property, his discretion being only to pay said Sophia the said income, use it for the support of said Sophia and her children, or add it to the principal of said trust, and hold the whole, principal and income, for her children upon her death, hence he is advised and insists that it is unnecessary to set forth his account in matter of the said income from the trust property held by him as aforesaid; he further says he has not conveyed the said property into said trust; that there has been and is no agreement, express or implied, writ-

ten or unwritten, whereby he is to re-imburse himself for moneys paid and obligations assumed in purchase of said Palatka property from the sale thereof, or any part thereof, and hold the residue or remainder for Mrs. Carr, if any residue or remainder; that the legal title to the said Palatka property is in James Burt, but only naked legal title, and that he holds that at the will and pleasure of defendant, except defendant has frequently, both before and subsequent to time when said actions were began and said judgments obtained as stated in said bill, requested James Burt to convey to him the naked legal title supposed to be in him, and that said Burt, without refusing so to do, has excused himself for not complying with his request by reason of suits anticipated or commenced against him for said property; that he is informed and believes that Mrs. Carr has also made like request of said Burt; that there is nothing due from him on account of his purchase of said Palatka property; that defendant holds as a *bona fide* purchaser for valuable considerations from Mrs. Carr, all and every her interest in said property, and that he purchased all the right, title, and interest of said Sophia and said Call, or either of them, in and to every part and parcel of said property, and all the rights and privileges appertaining thereto; that he has no knowledge of his own of the value or price of property in Palatka, Florida, but that at the time of his purchase thereof its cash market value was not much, if any, more than he paid for it, under the circumstances, and that he is informed it is now worth the sum named, if sold under favorable conditions and terms of payment; that the deed of Sophia R. Carr and Wilkinson Call to him was executed, delivered, and recorded about one year and a half prior to the recovery of the judgments.

The complainants filed replication to Loring's answer. There were only two witnesses, N. H. Moragne and James Burt, examined. The former testified that the Palatka

property was worth about $15,000 in December, 1871, and the latter, that it was worth $25,000, and that it was assessed in 1871 at a valuation of $10,000, and at $12,000 for 1872, he returning it to the assessor at the same time. The consideration expressed in the deed to Loring is $1,767.07, and " other good and valuable considerations."

On the 29th day of December, 1875, the Circuit Court made a final decree to the effect that the deed of conveyance from Sophia R. Carr and Wilkinson Call to the defendant, Loring, should be deemed and taken as a mortgage security, and valid as such to the extent of securing to the said Loring the payment of all moneys by him actually paid out and advanced to the said Sophia R. Carr, or on her account as the consideration for the same ; and that the Palatka property specified in the bill of complaint as the property of the defendant, Sophia R. Carr, was liable to and subject to the payment of the demands of the judgment creditors, the complainants, after the payment to Caleb W. Loring the amount due upon the said mortgage security ; and that if the defendants should not pay or cause to be paid to the complainants, or their solicitor of record, within twenty days from the date of this decree, the several and respective amounts due upon the judgments and executions mentioned in the bill of complaint, together with all the costs of this suit, then, in that event, the said real estate, or so much thereof as may be necessary, is hereby decreed to be sold, and the proceeds applied to the payment of said judgments, executions and costs, after paying the amount due said Caleb W. Loring on his mortgage security ; and that if the parties to the suit should be unable to agree as to the amount due Loring, there should be a hearing before the Master as to the same, and that a sufficient quantity of property should be sold to pay any other judgment creditors of B. E. Carr & Co., who should come into this suit and file certified copies of their judgments be-

fore the Master and contribute to the expenses. The decree reserved its decision upon the question of the liability of the testamentary trust property in Massachusetts held by Loring until it should be ascertained that the Palatka property was insufficient to pay Loring and complainants.

From this decree Loring appealed.

*Patterson & Meek* for Appellants.

*H. Bisbee, Jr.*, for Appellees.

The CHIEF-JUSTICE delivered the opinion of the court.

This is a creditor's bill by Dunning and others against Mrs. Sophia R. Carr and others, judgment debtors, and Caleb W. Loring, grantee, of certain property which the complainants seek to subject to the payment of their judgment. Loring alone answers the bill.

The answer alleges that by the articles of copartnership between Mrs. Carr and her copartners, she was a special partner and not liable for the debts of the firm beyond the sum of three thousand dollars, according to the statute regulating partnerships. Premising that if these facts were proved they do not constitute a defence in this proceeding, it is only necessary to remark that such defense should be made, if at all, by Mrs. Carr when she was sued for the debt of the firm. The indebtedness having been established against her by the judgment recovered against her and her partners, it is too late to interpose such supposed defence. The consideration of an indebtedness established by a valid judgment is beyond the reach of inquiry under a creditor's bill.

It is established by the pleadings and proofs that the Palatka property conveyed by Mrs. Carr to Loring was worth a much larger sum than that which he had or agreed to pay her for it. In 1870, she recites in the paper designa-

ting Mr. Call as her trustee that she deems it advisable to sell the real estate at $24,000 and invest the proceeds in U. S. bonds. This may be deemed her estimate of its value at that time. In 1871, the year in which the conveyance was made to Loring, the lands conveyed are estimated by James Burt, the trustee, at the value of twenty-five thousand dollars. The witness Moragne estimates it at fifteen thousand dollars. There is no testimony as to its present value, and it is not apparent that its value at the time of filing the bill in this case was less than in 1871.

It is urged in argument by the appellant that even if Mrs. Carr's conveyance to Loring had been a mere voluntary conveyance, it could not be impeached, because, he says, she had other property remaining in her hands of the value of four thousand dollars and upwards, out of which the complainants could make their demands.

While the proposition is in general correct, that a voluntary conveyance is not necessarily fraudulent as to creditors, abundant property remaining to satisfy them, we find no facts proved in this case calling for the application of the rule. It is said in the answer that she had in 1871 in the hands of Mr. Call, beside the real estate, over four thousand dollars of personal estate, besides a large amount of debts due to the firm of B. E. Carr & Co., of which she was a member. There is no proof whatever that this statement is correct; or if correct, that the debts of the firm and her individual debts and the liabilities of the estate of her husband, other than those assumed by Loring, were less than the amount of this personal property. On the other hand, it is admitted that the execution issued upon judgments against her and her firm have been returned wholly unsatisfied, and that they have no property subject to execution. In the absence of any explanation, it must be presumed that there was no such surplus, or that in some manner it has

been put beyond the reach of her creditors, or absorbed in the payment of debts without satisfying all of them.

It is finally urged on the part of the appellant that the complainants cannot maintain the allegation of fraud in the execution of the conveyance by reason of the inadequacy of the consideration alone, or even by the additional fact that the grantee had notice of the pecuniary embarrassment of the grantor. That even the fraudulent intent of the grantor did not affect the purchaser who had no notice of such intent. In other words, that if he purchased in good faith, and for a valuable consideration, the conveyance to him would be upheld.

An examination of the circumstances under which the conveyance in question took place will show that the rule contended for can hardly be applied to this case. Mrs. Carr was the widow of B. E. Carr, and was at the time of her husband's death the beneficiary of a considerable amount of real and personal property, the real estate having been placed in the hands of a trustee for her use. She was engaged in settling the affairs of his estate, and in carrying on a mercantile business under the firm name used by her husband and partners in his life time. The new firm incurred debts in carrying on the business. It is evident that defendant Loring knew her circumstances. He was a trustee of an estate in Massachusetts, of which she was the *cestui que trust.* He states in his answer that early in December, 1871, *she informed him* that she was "embarrassed and in great trouble" in relation to the settlement of her husband's estate, and it was necessary to raise money for the purpose of settlement, and requested him to buy her house in St. Augustine, which she offered at a very low price. He resided in Boston, and still resides there. He sent his attorney, Snow, to Florida to assist her in her trouble. Found Call in possession of her real and personal property, "amounting to many thousand dollars." She wanted him

to aid her with money, get the property and hold it for his own security for advances, and to the end that she might have the benefit of its greater value over and above contemplated advances, which were in the aggregate less than five thousand dollars. She wanted him to give her an obligation to this effect, but he (Snow) declined to "incumber the property with a trust," and *seeing no other way out of her difficulty*, she consented to give Loring an absolute conveyance of the property upon the terms proposed by Snow, the defendant Loring consenting to the terms by telegraph. The sums to be paid and advanced were, as detailed in the answer, somewhat indefinite as to the precise amount. Among the items is one of $381 for the expenses of *his* agent Snow in coming from Boston and transacting this business. The whole transaction was without the knowledge of Mr. Burt, who held the legal title to the real estate in trust. He "was not advised with, and could have known nothing until after it was closed." There is no explanation of this fact, and no reasons given why Mr. Burt, the trustee, who, previous to that time, had been a trusted friend of the family, and who lived in the immediate vicinity, was kept in ignorance of this important transfer.

Mr. Loring was not seeking this property for the purpose of investment, and from the time of her application to him up to the time of the purchase he did not see it. Mrs. Carr, it appears, sought him, and informed him that she was "embarrassed and in great trouble" in pecuniary matters, and besought him to buy her St. Augustine house. At this point it was that he began to act and sent Mr. Snow, his agent, to assist her.

The price or value of the property is not agreed upon or fixed in any manner, nor is it definitely named in the deed. In the negotiation several amounts which he is to pay are named, and several items indefinite in amount are included. This is a somewhat peculiar mode of transacting this kind

of business; peculiar on the part of both buyer and seller, if it be regarded as a purely *bona fide* bargain and sale. The item of $381 for the expenses of the *purchaser's agent* in making the purchase, to be *paid by the seller*, is something out of the ordinary track of business. Yet Mrs. Carr is to pay and allow as part of the purchase-money this item, not her own debt.or her own benefit, but the expenses of the purchaser in buying her property again, the conveyance by Call and Mrs. Carr of the real estate to Loring. Also conveys to him " and to his heirs and assigns forever, all the goods and chattels, houses, lands and estate, both real and personal," referring to all her interest in the mercantile firm, and its property, and " all bills, notes, accounts, moneys," &c., which the answer says were of the value of " several thousand dollars," and " of the value of four thousand dollars, besides a large amount of debts due the firm." What became of this personal property after it was thus transferred to Mr. Loring does not appear, except as stated in the answer, that she continued to carry on the mercantile business after Mr. Snow had assisted her in obtaining control of her personal and other property from Call. If it be true, as he states, that he obtained this real property, worth fifteen to twenty thousand dollars, or more and personal property worth four thousand or more, for $1,767 cash, and his promise to pay about $3,000 more, (including his own expenses in driving the bargain,) knowing as he did from Mrs. Carr that she came to him in her distress from pecuniary embarrassments, and that she desired his assistance to save her property from sacrifice, that creditors were pressing, and Call, the trustee, was threatening, it presents a case in which a court of equity would be reluctant to withhold its power either in her behalf or in behalf of her creditors. There is no escape from the conclusion, from this record, that Mrs. Carr's inability to pay these judgments has arisen from the absorption by this defendant of all her property in

exchange for a "mess of pottage." He, however, says, in his own behalf, that though his purchase was absolute and *bona fide*, yet "he does not intend personally to make any profit out of said transaction," but if the property brings in more than the cost and expenses, he intends to "pay the same into the principal fund of the trust estate, which he holds in strict trust for said Sophia R. Carr and her children," but protests that he has never made any agreement to do so; and right here it is that equity steps in to give appropriate direction. It is apparent from the whole case that the intention to secure this property to Mrs. Carr and her children influenced this defendant, and it is honorable on his part to make announcement of his intention to deal justly by those whose property he so absolutely controls. He should go yet farther toward relieving them from this indebtedness, and in this he must have the aid of this court. His expressed intention to appropriate the greater part of the value of the Palatka property for the benefit of this judgment debtor and her family, may fairly be said to have been formed when he advanced money to relieve them of a portion of Mrs. Carr's embarrassments; and this is precisely what the complainants, as creditors, complain of and are striving to prevent.

The question of fraud is one of motive and intent; a conclusion to be inferred from all the circumstances of the case. In Chesterfield et al. vs. Jansen, 2 Ves. 125–155–6, Lord Hardwicke, in classifying the various kinds of frauds, says: "A third kind of fraud is that which may be presumed from the circumstances and condition of the parties contracting. * * But it is wisely established in this court to prevent taking surreptitious advantage of the weakness or necessity of another, which knowingly to do, is equally against conscience as to take advantage of his ignorance. A fourth kind of fraud may be collected or inferred, in the consideration of this court, from the nature and cir-

cumstances of the transactions as being an imposition and deceit upon the other persons not parties to the fraudulent agreement.   Particular persons in contracts shall not only contract *bona fide*, as between themselves, but shall not transact *mala fide* in respect to other persons, who stand in such relation to either as to be affected by the contract or the consequences of it ; and as to the rest of mankind, beside the parties contracting are concerned, it is properly said to be governed on public utility."

If the transaction in question was not an imposition upon Mrs. Carr, taking advantage of her necessities while " in great distress " and " embarassment," according to defendant's answer, and thus perhaps liable to be set aside even by her, and it was fully acquiesced in by her, it may fairly be regarded as an imposition upon other persons not parties to it—" *mala fide* as to other persons who stand in such relation to either as to be affected by the contract or the consequences of it," and thus against public policy, according to the language of Lord Hardwicke.

The purchase of the property under the circumstances, not at the suggestion or solicitation of Loring, but at the sole solicitation of the debtor, with full notice of the financial embarassment of the debtor ; without contracting for a specific price or consideration, as though it was of no consequence ; the payment as part of the consideration of the purchaser's expenses in making the purchase ; the legal title remaining in Mrs. Carr's trustee ; the possession remaining unchanged ; the relations of the contracting parties, the purchaser being the trustee of the seller's estate in Massachusetts ; the gross inadequacy of the price paid, or agreed to be paid ; the total disappearance of several thousand dollars in value of personal property and effects of Mrs. Carr, which were conveyed with the land to the purchaser, Loring—all give to this case an aspect which is far different from the mere purchase of property in the ordinary course.

of business, for an inadequate consideration, with or without notice of the vendor's indebtedness.

Here appear a multitude of facts, which, taken together, destroy the presumption of good faith on the part of seller and purchaser, " in respect of the rights of others who were not parties to it."

The appellant says that by the decree the complainants have accomplished for Mrs. Carr what she could not have asked in her own behalf, to-wit: the construction that the deed is merely a mortgage. Whether Mrs. Carr could have asked and obtained such a decree, under the circumstances, is not the question here. Mrs. Carr says nothing. The decree goes against her by default, and upon the record the bill stands confessed by her. The decree gives to the defendant Loring a lien upon the property to the amount paid by him, and the conveyance for this purpose is treated as a mortgage so far as the rights of the complainants are affected, and whether it is technically or appropriately deemed a mortgage *eo nomine,* is of little consequence. The court gives the defendant Loring a preferred lien for the money advanced, and he may well be content with the priority accorded to him. His conveyance is deemed by the court to be voidable by the creditors only so far as it purports to be evidence of an absolute sale *as against complainants.*

As Mr. Loring's legal and equitable rights are saved by the decree in this form, he cannot reasonably complain of it. As is said by the court in Barrow vs. Bailey, 5 Fla., 45: " In equity, where a security or conveyance is found to be constructively fraudulent, it is upheld in favor of one not guilty of fraud, to the extent of the actual consideration, and is vacated only as to the excess ; and so when the property is of greater value than the consideration, the conveyance may be impeached as being voluntary to a partial extent, and if there be no actual fraud (on the part of the grantee) will be sustained to the extent of the consid-

eration and vacated as to the residue, or the grantee be decreed to be, as to such residue, a trustee for creditors." And the court says further, quoting from Chancellor Kent, that nothing can be more equitable than this mode of dealing with these conveyances, of such indecisive and dubious aspect, that they cannot either be entirely suppressed or entirely supported with satisfaction and safety.

We commend and adopt the able opinion of Mr. Justice Thompson in Barrow vs. Bailey upon the question of fraud in the conveyance of this property.

The decree of the Circuit Court is sustained.

The appellants filed a petition for re-hearing, which the court denied.